IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 4, 2011

**JOHNNY J. PETERSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 06-06768      James C. Beasley, Jr., Judge**

**No. W2011-00367-CCA-R3-PC  - Filed March 29, 2012**

The petitioner, Johnny J. Peterson, appeals the post-conviction court's denial of his petition for post-conviction relief from his first degree murder and attempted first degree murder convictions.  On appeal, he argues that he received the ineffective assistance of counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., J., joined.  JOSEPH M. TIPTON, P.J., filed a concurring opinion.

Lance R. Chism, Memphis, Tennessee, for the appellant, Johnny J. Peterson.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich, District Attorney General; and Kirby May, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted of first degree murder and attempted first degree murder by a Shelby County Criminal Court jury and was sentenced to concurrent terms of life imprisonment and twenty-one years, respectively.  The petitioner challenged the sufficiency of the convicting evidence on direct appeal, and this court affirmed the judgments below. See State v. Johnny Peterson, No. W2008-01340-CCA-R3-CD, 2009 WL 2985950 (Tenn. Crim. App. Sept. 18, 2009), perm. to appeal denied (Tenn. Mar. 15, 2010).  The Tennessee Supreme Court denied his application for permission to appeal.  Id.  The underlying facts of the case were recited by this court on direct appeal as follows:

On August 10, 2006, the [petitioner] was charged with the first degree murder of Alfred Henderson and the attempted first degree murder of Delaney Haynes. A trial commenced on March 17, 2008. On March 20, 2008, the jury returned its verdicts finding the [petitioner] guilty on both charges. From the trial, we summarize the following testimony.

Delaney Haynes testified that on the morning of March 9, 2006, he was sitting at a bus stop across the street from the In and Out Grocery located on the corner of Pearce and Chelsea Streets. Mr. Haynes stated that a "gray box Chevy" pulled up to the store and "one dude jumped out and [went] in the store." Mr. Haynes then saw the [petitioner] get out of the Chevy and walk across the street toward him. Mr. Haynes said that the [petitioner] called him "the N word and then he swung," hitting Mr. Haynes in the jaw and the two began to fight. Mr. Haynes explained that he "was into it" with the [petitioner]'s uncle who owed Mr. Haynes twenty dollars. Neither Mr. Haynes nor the [petitioner] had a weapon, but the [petitioner] told Mr. Haynes that he was going to kill him. Someone grabbed the [petitioner] from behind and broke up the fight. The [petitioner] crossed Pearce Street and got into the Chevy. Mr. Haynes said the driver of the Chevy drove away and stopped on Chelsea where "they were talking to Jimmy [Freeman]" and "[t]hen they pulled off."

Mr. Haynes stated that Alfred Henderson, nicknamed "Scooter," crossed the street and called out to him and asked what was going on. Mr. Haynes told him that "the dude say he's fixing to come kill me." Mr. Haynes testified that he was afraid that the [petitioner] was going to come back and kill him because he had threatened him during the fight. Mr. Henderson told Mr. Haynes that he was going to talk to the [petitioner] and that he did not want trouble in the neighborhood. Mr. Haynes and Mr. Henderson stood talking in front of Mr. Freeman's house located across the street from the In and Out Grocery. The driver of the Chevy pulled out of the parking lot, into the street, and stopped in front of where they stood. Mr. Haynes stated that he looked into the Chevy and saw a gun "just out [of] the window . . . then [he saw] the clip was falling out [of] the gun." Mr. Haynes saw the [petitioner]'s face when he leaned forward to put the clip back in the gun. The [petitioner] pointed the gun "right at him," and Mr. Haynes yelled "[t]hey got a gun," and ran. He said that the [petitioner] started shooting and Mr. Henderson was hit.

Mr. Haynes stated that he waited at the crime scene until the police arrived and then rode with them to the police station. On the way to the police

station, he spotted the Chevy in the backyard of a house on Pearce Street and identified it to the police as the vehicle that had been involved in the shooting. On the following day, Mr. Haynes identified the [petitioner] in a photospread sheet and wrote on the sheet "This [is] the one who pulled the pistol and [shot] at me but hit someone else."

On cross-examination, Mr. Haynes stated that after the fight, Mr. Freeman came out of his house clearly displaying a gun. Mr. Haynes agreed that when he gave a statement to the police on the day of the shooting, he did not say that the [petitioner] had threatened to kill him or that he saw the [petitioner] push a clip back into the gun. Mr. Haynes agreed that at the preliminary hearing, he said the [petitioner] was probably shooting at him, and also testified that the [petitioner] "was just shooting, no aim or nothing." Mr. Haynes explained that at the time of the shooting, there were five or six people standing in the street. He stated "when I first looked at [the petitioner], he was aimed at me. And when I ran, it was-he was just shooting." On redirect examination, Mr. Haynes said that at the time of the shooting, only the [petitioner] had a gun.

Frederick Jones testified that he had been convicted of burglary and attempted burglary. He stated that he was twenty-seven years old and that the [petitioner] was twenty-two or twenty-three years old. Mr. Jones identified the [petitioner] as his "god-brother." In March of 2006, Mr. Jones was living with the [petitioner]'s family on Pearce Street. He recalled that March 9th was Sammy Peterson's birthday. At around eight o'clock in the morning, Mr. Jones, the [petitioner], Sammy,[1] and one of Sammy's friends rode up to the In and Out Grocery in Sammy's Chevy on their way to "purchase a bag of weed to smoke." When they stopped at the store, no one in the Chevy had a gun. Mr. Jones got out of the Chevy and went into the store to buy some chicken. He came out of the store and the Chevy was gone, but it was soon returned and Sammy pulled the vehicle onto the store parking lot. Mr. Jones got into the backseat and Sammy turned the Chevy around and exited the parking lot going straight across Chelsea to Pearce Street. There were people in the street, but Mr. Jones did not see anyone with a gun and no shots were fired at

---

[1] The [petitioner] and Sammy Peterson share a surname. Therefore, for clarity, we have chosen to refer to Sammy Peterson by his first name. We mean no disrespect to Sammy Peterson.

the Chevy. Mr. Jones said that he began to eat his chicken and suddenly heard gunfire "from the back window on the left side of [his] ear." When he looked up, Mr. Jones saw the [petitioner] shooting a black nine millimeter Beretta gun out of the back left window of the Chevy. Mr. Jones stated that the [petitioner] was aiming the gun at "three guys" standing on the sidewalk beside a vehicle. After four or five shots were fired, Sammy drove the Chevy straight down Pearce Street and turned left onto Dunlap Street. Mr. Jones stated that the [petitioner] got out of the Chevy and said "he was sick of these bitches f***ing with him or something like that" and "[h]e needed some more bullets." Mr. Jones returned to the house on Pearce Street and changed his clothes. The police came to the house, took him to the police station, and questioned him about the shooting. Mr. Jones stated that he initially lied because he was nervous, but he later told the police about the shooting and identified the [petitioner] and Sammy from a photospread sheet. On cross-examination, Mr. Jones stated he never heard the [petitioner] say that he was going to try to kill Mr. Haynes. On redirect examination, Mr. Jones said that the house on Pearce Street was close enough for the others to have returned to get a gun while he was in the store. On recross-examination, he confirmed that when he gave his statement, he did not mention that the [petitioner] said he needed more bullets. However, Mr. Jones stated that he "mentioned it to the investigators when they [came] by [his] house."

Ben Daniels testified that he lived in the area where the shooting occurred. Mr. Henderson, his step-cousin, did not live in the area, but he often came by the neighborhood to visit before going to work. Mr. Daniels said that he did not see the fight between Mr. Haynes and the [petitioner], but he arrived at the scene just after it had occurred. He saw Mr. Henderson, Mr. Freeman, and Mr. Haynes "sitting at the back of [Mr. Henderson's] car talking about the fight." While Mr. Daniels was standing at a nearby bus stop talking to a friend, he heard four or five shots fired and saw that the shots were fired from a gray and black Chevrolet. Before the shots were fired, the Chevrolet pulled out of the store parking lot and stopped. When the shots were fired, Mr. Freeman fell and Mr. Haynes ran across the street toward the store. Mr. Henderson was hit and ran toward the front of his parked vehicle, then collapsed on the steps of Mr. Freeman's house.

Officer Stacey Hughes with the Memphis Police Department testified that on March 9, 2006, she was patrolling North Memphis in a squad car with a police officer trainee, Shonda Harris. They responded to a call reporting a shooting at Chelsea and Pearce Streets. Officer Hughes and Officer Harris

were the first police officers to arrive at the scene. They found the victim of the shooting laying on the sidewalk and unresponsive. The victim was taken to the hospital by the fire department. The crime scene was "very chaotic" with people everywhere "fighting amongst themselves all around." Officer Hughes stated that she began to secure the crime scene and called for more police cars.

Officer Roger Wheeler with the Memphis Police Department crime scene unit testified that on March 9, 2006, he responded to a homicide call on Chelsea. When he arrived at the scene, a heavy rain had started. Officer Wheeler and his partner immediately photographed the blood on the sidewalk before it was washed away. He identified a nine millimeter Luger Winchester casing found on the sidewalk in front of a house on Chelsea, a photograph of a bullet hole found in a vehicle parked at the scene, and the victim's broken eyeglasses found in the street.

Officer Anthony Mullins with the homicide unit of the Memphis Police Department testified he investigated the crime scene on the day of the shooting. A heavy rain started to fall before he was able to conclude his investigation of the scene. Officer Mullins confirmed blood was washed away by the rain and a shell casing had to be covered because "it was blowing along the street." Some witnesses were brought into the homicide office for questioning including Mr. Haynes. While Mr. Haynes was being transported to the police station, he spotted a vehicle parked in the backyard of a house on Pearce Street and identified it as the vehicle involved in the shooting. During the investigation, the [petitioner] was identified as a suspect. The homicide unit created a photospread sheet to determine if witnesses could identify the shooter. Two witnesses identified the [petitioner] as the shooter and Sammy was identified as the driver of the vehicle. The police attempted to locate Sammy and the [petitioner] by checking addresses and following up with family members. On March 17th or 18th, arrest warrants were issued. A few weeks later, the [petitioner] was arrested.

Officer Mullins stated he was familiar with the area where the shooting occurred and estimated that the distance between the [petitioner]'s house on Pearce Street and the crime scene was "a couple of long blocks[.]" He stated that it would take less than a minute to drive between the two points.

Sergeant Caroline Mason with the Memphis Police Department testified that she interviewed the [petitioner] on April 2, 2006. When she

entered the interviewing room, the [petitioner] appeared to be upset and was crying. He announced that he did not shoot anyone and claimed he was "afraid of guns and firecrackers." The [petitioner] stated that he knew the police were looking for him, but said that he did not know why.

The [petitioner] told Sergeant Mason that on March 9th, he walked down the street and got an estimate from a mechanic for the cost to repair a fuel pump and then returned home to work on his vehicle. He stated that he walked back to the repair shop to see about getting his vehicle towed, but the cost for towing the vehicle was too much. The [petitioner] called his cousin and they spent the rest of the day "just smoking weed and chilling." The [petitioner] told Sergeant Mason that he did not return home because he was told that there had been a shooting at the In and Out Grocery and the police were looking for him.

Dr. Lisa Funte testified that she worked as a medical examiner with the Shelby County Regional Forensic Center and that she performed an autopsy on the victim's body. Dr. Funte stated that her report reflected that the victim was a twenty-seven year old African American male and that she determined through her examination that the victim's cause of death was a gunshot wound.

The [petitioner] testified that he knew Mr. Haynes from around the neighborhood because Mr. Haynes and the [petitioner]'s uncle had become involved in a conflict. The [petitioner] believed that his uncle was vulnerable to other people due to his drug use and mental problems. According to the [petitioner], prior to March 9th, he went to the In and Out Grocery in response to a telephone call. When he arrived at the store, he saw Mr. Haynes leaving the area, but did not speak to him. The [petitioner] found his uncle nearby with a "little scar over his eye and . . . blood out of his mouth."

The [petitioner] said that on the morning of March 9th, he "grabbed [his] gun and [he] went outside to work on [his] car." The [petitioner] stated that he always had his gun with him "due to the problems . . . in the neighborhood." While he was working on his car, the [petitioner]'s brother, Sammy, drove up in his gray Chevy with Mr. Jones and someone else named Kevin. Sammy gave the [petitioner] a ride to the mechanic's shop. On the way home, they stopped at a gas station and the In and Out Grocery. Mr. Jones went into the store to buy cigars. The [petitioner] spotted Mr. Haynes at a bus stop across the street. He left his gun on the back seat of the Chevy

-6-

and walked over to ask Mr. Haynes why he was "jumping on" his uncle. As the [petitioner] approached, Mr. Haynes jumped up and the [petitioner] hit him. A fight ensued between the [petitioner] and Mr. Haynes. The [petitioner] denied that he told Mr. Haynes that he was going to kill him. During the fight, the [petitioner] heard "this dude saying 'Hell no. Hell no[,]'" and saw Mr. Freeman crossing the street with a gun. The [petitioner] stated that he was afraid that Mr. Freeman was going to shoot him and he broke away from the fight and ran to the Chevy. Mr. Jones was coming out of the store and he also got into the Chevy. As Sammy pulled the Chevy out of the parking lot, Mr. Freeman stood behind a pole "on the side of the car . . . like he was fixing to shoot[.]" The [petitioner] stated that he did not look out of the window, but ducked down and "just fired a shot." According to the [petitioner], he was not trying to kill anyone and explained that "[i]t was [an] honest mistake." After the shooting, the [petitioner] told Sammy to drop him off on Dunlap Street. On cross-examination, the [petitioner] said that he took a gun with him everywhere he went. He confirmed that he ducked down and shot out of the window without aiming the gun in order to scare Mr. Freeman. He agreed that he fired in the same direction that Mr. Haynes was standing. The [petitioner] said that at the time of the shooting, the clip on the gun held ten bullets and was full.

Id. at *1-4.

The petitioner subsequently filed a *pro se* petition for post-conviction relief, followed by three amended petitions after the appointment of counsel. In his petitions, the petitioner raised, among other things, numerous allegations of ineffective assistance of counsel, including the allegations pursued on appeal – that counsel was ineffective because he failed to request a jury instruction on self-defense, raise the issue in his motion for new trial, or argue on appeal that the failure to give the instruction was plain error. The post-conviction court conducted an evidentiary hearing, at which, counsel testified[2] that he represented the petitioner in his first degree murder trial and on appeal. He received his law license in 1996 and practiced "exclusively criminal defense law." Prior to representing the petitioner, counsel had handled fifteen to twenty jury trials, eight to ten of which were murder cases. Counsel said that he was "capital certified."

Counsel testified that, after reviewing the discovery, conducting his own investigation, and discussing the case with the petitioner, he determined that a theory of self-defense was not a plausible argument. Counsel recalled that the facts showed that the

_____

[2] We will limit the majority of our factual recitation to the testimony relevant in this appeal.

petitioner and Delaney Haynes were involved in a fist-fight during which the petitioner told Haynes that he was going to kill him. After the fist-fight, the petitioner got into a car, witnesses saw him leave the scene, and then he returned and fired shots at Haynes. Instead, the petitioner struck and killed an unintended victim. Delaney Haynes said that Jimmy Freeman had a gun during the earlier fist-fight between the petitioner and Haynes, but Haynes never saw Freeman with a gun when the shots were fired. Moreover, the petitioner never told counsel that Jimmy Freeman "had actually shot at the car or had shot at the [petitioner] in any way," and the petitioner never indicated to counsel that he shot the gun in the direction of the man by the light pole who was allegedly pointing a gun at him. Furthermore, Frederick Jones, who was in the car with the petitioner, said that "he didn't have the slightest idea why the [petitoner] was shooting at the guys when he shot out the window of the car." Jones had also recalled that the petitioner said "he was sick of these bitches fucking with him and that . . . he needed more bullets."

Counsel felt that the petitioner's actions after the shooting also did not support a claim of self-defense. Counsel recalled that the petitioner did not call the police to report that someone was "trying to shoot or kill [him] and [he] had to fire . . . to defend [him]self." The petitioner also threw the gun he had used into the river and then "hid out from the police for approximately a month before he was finally arrested even though he knew the police were searching for him." After the petitioner was arrested, he lied to the police, telling them that he was not involved and that he had an alibi for the time of the shooting. In light of these reasons, instead of self-defense, counsel opted to pursue a theory of defense that the shooting was a reckless homicide. Counsel felt that reckless homicide was a "much more plausible" defense and that also arguing self-defense as an alternative theory "would weaken [their] reckless homicide argument."

Counsel admitted that he did not request that the trial court instruct the jury on self-defense. He explained that he did not request the instruction because self-defense was not the theory of their case, and he was not going to argue self-defense. He acknowledged that the jury could have considered whether the shooting was in self-defense had the court given such instruction; however, he did not consider it to be a plausible defense. Counsel said that, in hindsight, the issue of self-defense could have been "raised to [the] jury through the jury instruction," but he did not request it at the time because he was focused on reckless homicide. Counsel indicated that he would have asked for a self-defense instruction "[h]ad [they] developed something along the self-defense lines with the testimony . . . or just the investigation and discovery, but the problem . . . was that his actions after the fact did not imply that at all." Counsel elaborated that "once [they] looked at the overall and developed [their] theory of reckless, [he] didn't intend on asking the judge to give a self-defense jury instruction."

Counsel acknowledged that he did not allege in the motion for new trial that the trial court erred in failing to instruct the jury on self-defense. He explained that he did not incorporate the issue because he had not asked the court to give the instruction and had his request denied. Counsel acknowledged that there was case law that said the court should give an instruction on a defense where the issue was "fairly raised by the proof."

Counsel testified that he did not raise the trial court's failure to give a jury instruction on self-defense as plain error on appeal because he had not asked for and had been denied an instruction on self-defense. He said that he investigated and researched the issues raised in the motion for new trial, and he did not incorporate all of those issues in the appellate brief. He only incorporated the issues "that had merit after doing additional research on the issues." Counsel summarized:

> I guess theoretically you could [have] argued [self-defense]. But, again, I felt that the plausible argument was the reckless homicide. That to try to attempt to argue self-defense in this case based upon the facts and the information that was developed and testified to that it wouldn't be a plausible defense.

Counsel said that all the decisions he made regarding whether to request a self-defense instruction were trial tactics based upon his experience as an attorney. He explained that he had argued alternate theories before. However, he elected not to do that when one argument "was clearly much more plausible to the jury and by trying to argue both you were going to weaken your argument to the jury."

In denying the petition, the post-conviction court found, as to the petitioner's issues regarding self-defense, that there were no witnesses to corroborate the petitioner's allegations that he saw a man in the crowd pointing a gun at him and that he fired his weapon to scare the man and give him a chance to escape. The court observed that a witness who was in the car with the petitioner recalled the petitioner's stating, "'I am sick of these bitches fucking with me' and 'I need more bullets.'" The court noted that counsel testified that it was his trial strategy to show the shooting was a reckless act and that also arguing self-defense, in light of the petitioner's actions after the shooting, would weaken his chances for a reckless homicide conviction. The court found that counsel should not be deemed ineffective if his "logical and calculated trial strategy . . . does not work."

The post-conviction court also found that the trial court "obviously did not feel there was a basis for a self defense charge" and, upon review of the trial transcript, determined that there was indeed no basis for the court to instruct the jury on self-defense. The court noted that the petitioner was the only witness to raise the issue of self-defense and that "his testimony was greatly impeached." As such, the post-conviction court further found that

there was no basis to raise the issue as error in the motion for new trial or as plain error on appeal.

## ANALYSIS

On appeal, the petitioner argues that counsel rendered ineffective assistance because he failed to request a jury instruction on self-defense, raise the trial court's failure to give such instruction in his motion for new trial, or argue on appeal that the failure to give the instruction was plain error. Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the trial court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose

result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The same principles apply in determining the effectiveness of trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995).

The petitioner argues that counsel was ineffective for failing to request a jury instruction on self-defense. He asserts that the proof presented at trial fairly raised the defense, and, therefore, counsel was ineffective for not requesting the instruction.

At the time of the offense, self-defense was defined in the Tennessee Code as follows:

A person is justified in threatening or using force against another person when, and to the degree, the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Tenn. Code Ann. § 39-11-611(a).

Counsel testified that based on his review of the discovery and his own investigation, he made the informed and strategic decision to not pursue a defense of self-defense. Counsel stated that the facts surrounding the offense, and the petitioner's actions thereafter,

did not support such claim. Counsel believed that reckless homicide was the only plausible defense, and he was afraid that raising the alternate theory of self-defense would weaken his argument that the petitioner's actions were merely reckless. Therefore, counsel made the tactical decision to pursue what he determined to be the strongest argument. Again, this court may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Moreover, recently, in Henry Zillon Felts v. State, No. M2009-00639-SC-R11-PC, 2011 WL 5436302, at *13 (Tenn. Nov. 10, 2011), our supreme court addressed a scenario in which trial counsel had pursued a theory of self-defense exclusively, rather than to also pursue a lesser-included offense theory. The court held that trial counsel was not deficient for choosing a single, reasonable defense theory to the exclusion of another plausible, but inconsistent, theory. Id. The court also noted that the Court of Criminal Appeals "has repeatedly held that defense attorneys are not incompetent for failing to request jury instructions inconsistent with a chosen defense theory." Id. at n.9 (citations omitted). In light of counsel's testimony concerning his preparations in this case and his reasons for electing not to pursue a theory of self-defense, we discern no deficiency in counsel's failure to request a jury instruction on self-defense.

We also discern no prejudice caused by counsel's failure to request a jury instruction on self-defense. The petitioner's testimony at trial, which he asserts raised the suggestion that the shooting was in self-defense, was contradicted by other witnesses. Specifically, Danuel Ben's testimony indicated deliberateness in the petitioner's actions in that Ben said the car the petitioner was in was actually moving and then came to a stop long enough for shots to be fired. Frederick Jones, who was in the car with the petitioner, did not see anyone with a gun when the petitioner fired. Jones's testimony also indicated that the petitioner completely left the scene after the fist-fight and then returned several minutes later at which time the shots were fired as they were driving away. As such, we discern no prejudice caused by counsel's failure to request a jury instruction on self-defense as we fail to see any reasonable probability that the result of the proceeding would have been different had the instruction been requested.

The petitioner also argues that counsel was ineffective for failing to assign as error in the motion for new trial the trial court's failure to give the self-defense instruction on its own accord without a request by counsel. As to this issue, the post-conviction court found that there was no basis to list it as error in the motion for new trial, as there was no basis to instruct the jury on self-defense. We agree that, contrary to the petitioner's assertion that self-defense was fairly raised by the evidence, a review of the testimony at trial supports the post-conviction court's conclusion that there was no basis for a self-defense charge.

At trial, the petitioner claimed that he saw Jimmy Freeman with a gun at the time of the fist-fight and said that he was afraid. The petitioner also said that, as they were driving away in the car, he saw Freeman standing "slanted like in the pole like he was . . . trying to hide. But in the position where he . . . could have pulled a gun and shot[.]" Thus, according to the petitioner's own testimony, Freeman had not fired upon the petitioner or his friends, and Freeman was not pointing a gun in their direction – just that he, according to the petitioner, *could* have pulled a gun. Moreover, the petitioner and his friends were in a car driving away from the scene at the time the petitioner allegedly saw Freeman. Therefore, the petitioner's testimony did not suggest a reasonable belief that there was an imminent danger of death or serious bodily injury. Because there was no basis for giving the charge, we discern no deficiency in counsel's failure to assign as error, in the motion for new trial, the trial court's failure to give a jury instruction on self-defense.

The petitioner lastly argues that counsel was ineffective for failing to raise, as plain error on appeal, the fact of the trial court's not instructing the jury as to self-defense. As to this issue, the post-conviction court found that there was no plain error for purposes of appeal because there was no basis for the trial court to instruct the jury on self-defense.

The same test applies in determining the effectiveness of both trial and appellate counsel. See Carpenter v. State, 126 S.W.3d 879, 887 (Tenn. 2004). Appellate counsel does not have a constitutional obligation to raise every conceivable argument that might be made on appeal, id. (citations omitted), and the determination of which issues to present on appeal is a matter generally addressed to the professional judgment and sound discretion of appellate counsel. Porterfield v. State, 897 S.W.2d 672, 678 (Tenn. 1995). "[I]f an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal." Carpenter, 126 S.W.3d at 887.

In order for us to find plain error:

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Id. at 283.

Upon review, we discern no prejudice caused by the fact that counsel did not raise this issue as plain error on appeal because we do not see a reasonable probability that such claim would have been successful. As previously determined, there was no basis for giving a charge on self-defense as the proof did not suggest a reasonable belief that the petitioner faced an imminent danger of death or serious bodily injury. Thus, we cannot conclude that, had counsel raised the issue, the appellate court would have decided the issue in the petitioner's favor.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE